IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | CRIMINAL NO. JRR-23-146 |
| GARRICK POWELL, | |
| Defendant. | |

GOVERNMENT'S CONSOLIDATED MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANT'S MOTIONS

Erek L. Barron
United States Attorney

Stanton Lawyer
Patricia McLane
Assistant United States Attorneys

36 South Charles Street, Fourth Floor
Baltimore, Maryland 21201
410.209.4869
Stanton.Lawyer@usdoj.gov

July 15, 2024

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................... 1

FACTUAL BACKGROUND ........................................................................................................ 2

ARGUMENT ................................................................................................................................ 8

   I.   The Court Should Deny Mr. Powell's Motion to Dismiss Because Section 922(g)(1) is
Constitutional. ........................................................................................................................ 8

      A.   Section 922(g)(1) is Presumptively Constitutional. ................................................... 8

      B.   Section 922(g)(1) is Facially Constitutional. ............................................................. 9

      C.   *Heller* and its Progeny Confirm That Section 922(g)(1) is Constitutional. ................ 11

   II.   THE COURT SHOULD DENY MR. POWELL'S MOTION TO SUPPRESS
TANGIBLE AND DERIVATIVE EVIDENCE BECAUSE THE AUTOMOBILE
EXCEPTION APPLIES ......................................................................................................... 19

      A.   Officers Were Justified in Stopping Powell's Vehicle and Removing Him From the
Car.  20

   III.   THE COURT SHOULD DENY MR. POWELL'S MOTIONS TO SUPPRESS
STATEMENTS SEIZED BECAUSE THE STATEMENTS FOLLOWED MIRANDA
WARNINGS AND WERE VOLUNTARY. ........................................................................... 23

      A.   Mr. Powell Was Advised of His Rights Under Miranda. ........................................... 23

      B.   Mr. Powell's Volunteered Statements Do Not Implicate *Miranda* and Should Not be
Suppressed. .............................................................................................................. 25

CONCLUSION ............................................................................................................................ 26

The United States of America, by and through its counsel, Erek L. Barron, the United States Attorney for the District of Maryland, and Patricia McLane and Stanton Lawyer, Assistant United States Attorneys for the District of Maryland, respectfully submits this consolidated opposition to Defendant's Motion to Dismiss the Indictment Under the Second Amendment (ECF No. 46), Motion to Suppress Tangible and Derivative Evidence (ECF No. 45), and Motion to Suppress Statements (ECF No. 47).  The Court should deny each motion for the reasons stated herein.

## INTRODUCTION

Prior to April 19, 2023, the defendant, Garrick Powell, had been convicted of three felonies.[1]  So, on April 19, 2023, when Mr. Powell was carrying a Polymer 80 9mm handgun, which was modified with a "switch,"[2] loaded with 30 rounds of 9mm ammunition and had an extended magazine loaded with 33 rounds of 9mm ammunition in the trunk of his car, he was in violation of 18 U.S.C. § 922(g)(1) and 18 U.S.C. § 922(o).  On April 26, 2023, a Grand Jury in this district returned a two-count indictment charging Mr. Powell accordingly.  (ECF No. 1.)

Mr. Powell now moves to dismiss the indictment on Second Amendment grounds.  Relying almost entirely on *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022) and a non-binding out of circuit opinion, Mr. Powell launches a facial challenge and an "as-applied" challenge to the constitutionality of 18 U.S.C. § 922(g)(1) ("Section 922(g)(1)").  (*See generally* ECF No. 46.)

---

[1] According to the Pretrial Services Report prepared in this case, Mr. Powell was convicted of the following crimes: (i) Controlled Dangerous Substance: Possession with Intent to Manufacture, Distribute, Dispense Narcotics in 2015; (ii) Possess/Receive Weapon while Confined/Detained in 2015; and (iii) Intimidate/Influence Juror-Felony offense in 2015.  All three convictions carry a sentence of over one year imprisonment.

[2] A "switch" is a small device placed on the back of a firearm which converts a semi-automatic firearm into an automatic firearm, thereby creating a "machinegun" as defined in 26 U.S.C. § 5845(b).

1

Mr. Powell's facial challenge is foreclosed by the Fourth Circuit's holding in *United States v. Canada*, "Section 922(g)(1) is facially constitutional because it 'has a plainly legitimate sweep' and may constitutionally be applied in at least some 'set of circumstances.'" *Canada*, 103 F.4th 257, 258 (4th Cir. 2024) (quoting *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 (2008)).

Mr. Powell's as applied challenge fares no better for several reasons. *First*, the Supreme Court has repeatedly affirmed that laws like Section 922(g)(1) are "presumptively lawful" and the Fourth Circuit has done the same. *Second*, the Supreme Court's Second Amendment jurisprudence, most recently explicated in *United States v. Rahimi*, 144 S. Ct. 1889 (2024) requires this Court to confirm the constitutionality of Section 922(g).

Mr. Powell also moves to suppress certain evidence as well as statements he made during and after his arrest. These motions should be denied because the traffic stop that resulted in the seizure of evidence was lawful and any statements Mr. Powell made came after he received the *Miranda* warnings and were not the product of "interrogation" within the meaning of *Miranda*.

## FACTUAL BACKGROUND

On the morning of April 19, 2023, Mr. Powell was carrying a modified Polymer 80 9mm handgun and loaded with 30 rounds of 9mm ammunition as he walked the 500 block of N. Patterson Park Avenue in Baltimore, Maryland. The device that modified the handgun, often called a "switch", allows the handgun to fire automatically with one squeeze of the trigger.

Mr. Powell had the handgun concealed along or immediately below the waistband of his pajamas, and he used his left hand to support the weight of the weapon and the numerous rounds of ammunition. Mr. Powell walked across the street from his home, then returned to his side of the street and walked northbound on N. Patterson Park Avenue. All the while, Mr. Powell

continued to support the weapon in his pajamas, and at one point, he had to adjust the firearm due to a lack of a proper holster.

After talking to a few individuals, Mr. Powell got into the driver's seat of his vehicle, where he remained for approximately two minutes without moving the vehicle. When Mr. Powell exited the vehicle, he was no longer holding on to the left side of his pajama pants, suggesting to anyone watching that he had left the handgun in his car.

Detectives and officers from the Eastern District, Baltimore City Intelligence Center observed this entire sequence of events.  They were using Baltimore City CCTV Camera #629 located at Patterson Park Playground—an actual playground where children were playing shortly after Mr. Powell's arrest.  A screen capture of the footage from Camera #629 showing Mr. Powell clutching the handgun in his pants are below.[3]



---

[3] The footage captured by Camera #629 is being submitted as Exhibit A to this motion.  Mr. Powell appears in the footage from 08:00 to approximately 23:00 when he enters he enters his vehicle.

The officers operating Camera #629 had previously interacted with Mr. Powell and knew that because he had prior felonies, Maryland law prohibited him from possessing a handgun. Those officers and others, who had the same understanding about Mr. Powell's prohibited status, observed the live footage for several moments to confirm their belief that Mr. Powell was carrying a handgun. Several officers then went to the area near the 500 block of N. Patterson Park Avenue, while remaining in communication with the officer observing the live footage.

The officer watching the live footage saw Mr. Powell get into his vehicle and drive southbound on N. Patterson Park Avenue. That officer communicated this information to the officers on scene, who followed Mr. Powell and initiated a traffic stop. The primary bases of the traffic stop was their belief that Mr. Powell was prohibited from possessing a firearm, but nevertheless did so in violation of Maryland Public Safety Code § 5-133, and that Mr. Powell was transporting that firearm in his vehicle in violation of Maryland Criminal Code § 4-203.

One officer approached Mr. Powell's vehicle on the driver's side[4] while another approached on the passenger's side.[5] Mr. Powell was ordered to roll down his tinted windows and turn his car off, commands which were repeated several times. Mr. Powell initially complied with those commands. As the officer on the passenger's side of the vehicle approached the front window of the car, Mr. Powell closed the front passenger's side window. The officer then opened the front passenger door and continued to provide verbal commands to Mr. Powell. Mr. Powell was ordered to place and keep his hands on the steering wheel of his vehicle, which he did.

---

[4] The body worn camera ("BWC") footage from the officer who approached Mr. Powell's vehicle on the driver's side is being submitted to the Court as Exhibit B.

[5] The BWC footage from the officer who approached Mr. Powell's vehicle on the passenger side is being submitted to the Court as Exhibit C.

A few second later, Mr. Powell removed his right hand from the steering wheel and placed it across his waist. The officer on the passenger side of the vehicle saw this and alerted the other officers[6] that Mr. Powell was "reaching." The officer on the driver's side of the vehicle ordered Mr. Powell out of the vehicle, opened the door, and assisted him out of the vehicle. That same officer, while removing Mr. Powell from the vehicle, observed the handle of a firearm on the floorboard of the driver's side of Mr. Powell's vehicle. Mr. Powell was placed in handcuffs and from under the driver's seat the officer recovered a Polymer 80 9mm handgun with a grey frame and black slide, modified with a switch, and loaded with 30 rounds of 9mm ammunition. A screen capture from the officer's BWC showing where the handgun was located in Mr. Powell's car is immediately below. The arrow has been added to aid the Court.



---

[6] Shortly after Mr. Powell was stopped, additional officers arrived on scene and positioned themselves on the driver's side of the vehicle.

The officers determined that the registration to Mr. Powell's vehicle was suspended and thus subject to being towed.  The officers, accordingly, searched Mr. Powell's vehicle and located a black duffel bag containing an extended magazine loaded with 33 rounds of 9mm ammunition. The magazine fit the handgun that was found under the driver's seat.  Officers also located and seized four cellphones from inside Mr. Powell's vehicle.   The handgun, magazines, and ammunition are pictured below.



Mr. Powell was placed in the back of a Baltimore City Police Department ("BPD") SUV. Approximately 13 minutes later, Mr. Powell was advised of his *Miranda* rights.  The Defendant

acknowledged that he understood each right and declined to speak to law enforcement.[7]   The *Miranda* rights Mr. Powell was read is pictured immediately below.

Mr. Powell was transported to the BPD Eastern District Station.  During the trip, the officer transporting Mr. Powell observed him moving around in the back of the SUV.[8]   The officer requested that Mr. Powell minimize his movements and advised him that there was nothing in the back of the SUV prior to Mr. Powell being placed in the SUV.  Mr. Powell managed to move his hands, which were in plastic handcuffs, from behind his back to his front, and removed a small plastic bag from an unknown location on his person.  He tore the bag open and spread the contents in the back of the SUV.

At the station, Mr. Powell continued to try and disperse the powder by flicking it out of his pocket, pushing it around with his feet, and even blowing.  When the officer who transported Mr. Powell told another officer, who was helping to remove Mr. Powell from the SUV, that the powder was drugs, Mr. Powell chimed in that "this ain't drugs, it's soap powder."[9]   The powder was collected and submitted to the BPD Forensic Laboratory Section, which determined that the powder was cocaine base.

Mr. Powell is charged by indictment with (Count 1) Prohibited Person in Possession of Ammunition, in violation of Section 922(g)(1), and (Count 2) Unlawful Possession of a Machinegun, in violation of 18 U.S.C. § 922(o).  He moves to dismiss the indictment on Second

---

[7] Ex. C at 15:35 – 16:20.

[8] The body worn camera ("BWC") footage from the officer who transported Mr. Powell to the district station is being submitted to the Court as Exhibit D.

[9] Mr. Powell's conduct and statements from in the back seat of the BPD SUV at the BPD station are at Ex. D. 24:15 – 24:45; 25:40 – 26:15.

Amendment grounds and seeks the suppression of items seized as a result of the traffic stop as well as any statements he made during and after the same traffic stop.

## ARGUMENT

Mr. Powell contends that the indictment should be dismissed "as violative of his Second Amendment right to keep and bear arms." (ECF No. 46 at 1.)  Despite his attack on both Counts of the indictment, Mr. Powell references 18 U.S.C. § 922(o) ("Section 922(o)"), the basis for Count 2 of the indictment, only once in the introductory paragraph of his motion and Mr. Powell never advances any specific arguments regarding the constitutionality of Section 922(o) (*See generally id.* at 2-27.)  The Government focuses its opposition on his arguments regarding Section 922(g)(1). The Government also responds to Mr. Powell's meritless motions to suppress.  The Court should deny each of Mr. Powell's motions.

**I.     The Court Should Deny Mr. Powell's Motion to Dismiss Because Section 922(g)(1) is Constitutional.**

Mr. Powell contends that Section 922(g)(1) cannot survive the Second Amendment analysis the Supreme Court prescribed in *Bruen*.  Mr. Powell also argues that assuming Section 922(g)(1) is facially constitutional, it is nonetheless unconstitutional as applied to him.  Both arguments fail.

**A.  Section 922(g)(1) is Presumptively Constitutional.**

As an initial matter, the Supreme Court has repeatedly described statutes like Section 922(g)(1) as meeting constitutional muster.  For example, the *Heller* Court noted that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill" and that such laws were "presumptively lawful regulatory measures[.]"  *D.C. v. Heller*, 554 U.S. 570, 626, n. 26; *accord McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 786 (2010) (repeating the assurances that Section 922(g)(1) and similar laws are

constitutional).  In the most recent Second Amendment case decided by the Supreme Court, *United States v. Rahimi*, the Court rejected the defendant's broad reading of *Heller* and noted that the *Heller* Court had explicitly noted that the laws like Section 922(g)(1) "are 'presumptively lawful.'" *Rahimi*, 144 S. Ct. at 1902.  This should end the constitutional inquiry, and the Court need not "not 'undertake an exhaustive historical analysis . . . of the full scope of the Second Amendment.'" *Rahimi*, 144 S. Ct. at 1903.

Other jurists in this District have recently adopted this approach when finding that Section 922(g)(1) is constitutional.  *See, e.g.*, *United States v. Al Tariq Smith*, No. CR RDB-23-0126, 2024 WL 3344685, at *5 (D. Md. July 8, 2024); *Ferebee v. United States*, No. CR ELH-21-0472, 2024 WL 1416574, at *10 (D. Md. Apr. 1, 2024) (collecting cases and noting that the "wealth of cases referenced [therein] inescapably leads to the conclusion that 18 U.S.C. § 922(g)(1) does not violate the Second Amendment, either facially or as applied."); *Cusick v. U.S. Dep't of Just.*, No. CV TDC-22-1611, 2023 WL 5353170, at *5 (D. Md. Aug. 18, 2023) ("Because the Court determines that the conduct covered by 18 U.S.C. § 922(g)(1) is outside the scope of rights covered by the Second Amendment under *Heller*, *McDonald*, and *Bruen*, the Court need not engage in the analysis of analogues to 18 U.S.C. § 922(g)(1) in the historical tradition of the United States, as outlined in *Bruen*.").

### B.  Section 922(g)(1) is Facially Constitutional.

The Fourth Circuit recently held that Section 922(g)(1) is facially valid.  Mr. Powell's challenge to Section 922(g)(1) as facially unconstitutional must be rejected.

"A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987).  Recognizing this heavy burden in the context of continually developing Second Amendment law, the Fourth Circuit

recently rejected a facial challenge to Section 922(g)(1).  *United States v. Canada*, 103 F.4th 257, 258 (4th Cir. 2024) (quoting *United States v. Gay*, 98 F.4th 843, 846 (7th Cir. 2024).  The Fourth Circuit acknowledged that the state of Second Amendment law was in "flux" in the wake of *Bruen*, but no matter the "analytical path" it were to choose "they all lead to the same destination: Section 922(g)(1) is facially constitutional because it 'has a plainly legitimate sweep' and may constitutionally be applied in at least some 'set of circumstances.'"  *Id.* at 258 (quoting *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 (2008)).  Put another way, without regard to which of the frameworks this Court uses to analyze Mr. Powell's facial challenge to Section 922(g)(1), "the answer remains the same: the government may constitutionally forbid people who have been found guilty of ["a crime punishable by imprisonment for a term exceeding one year"] from continuing to possess firearms."[10]  *Id.*  The Court is bound the Fourth Circuit's decision in *Canada* and must deny Mr. Powell's facial challenge to *Section* 922(g)(1).

*     *     *     *

The Court need not engage in the extensive historical analysis that Mr. Powell urges it to engage in—Section 922(g)(1) is "presumptively lawful."  Nonetheless, if this Court is inclined to engage in the historical analysis done in *Heller* and its progeny, a brief discussion of the development of the caselaw is required, especially in light of Defendant's incorrect framing of that caselaw and failure to address *Rahimi*.

---

[10] While the Fourth Circuit cited four different federal statutes as exemplars of acts that may serve as reasons for the government to prohibit an individual from possessing a firearm, the broad language of Section 922(g)(1) includes within its scope state felony convictions.  18 U.S.C. § 922(g)(1) (prohibiting "any person . . . who has been convicted in *any* court of" a felony) (emphasis added).  The inclusion of the countless state laws, the violation of which are punishable by imprisonment for more than a year, further confirms that Mr. Powell simply cannot meet his burden when bringing a facial challenge.

**C.  *Heller* and its Progeny Confirm That Section 922(g)(1) is Constitutional.**

The Second Amendment provides that: "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II.

In 2008, the Supreme Court concluded that the Second Amendment confers an "individual right to keep and bear arms in case of confrontation."  *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008).  The Court noted, however, that as with other fundamental rights, "the right secured by the Second Amendment is not unlimited."  *Id*. at 626.  The Court further explained that "nothing in our opinion should be taken to cast doubt on *longstanding prohibitions on the possession of firearms by felons*[.]"  *Id*. (emphasis added).  In fact, the Court described such restrictions as "presumptively lawful regulatory measures."  *Id*. at 627 n.26.

Two years later in *McDonald v. Chicago*, 561 U.S. 742 (2010), the Supreme Court held that the Second Amendment applies to both the federal and state governments.  *Id*. at 750.  In deeming the challenged law unconstitutional, the Court "repeated [its prior] assurances" about what the Court was not doing: "[w]e made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill.'"  *Id*. at 786 (quoting *Heller*, 554 U.S. at 626-27).

Following *Heller* and *McDonald*, the Fourth Circuit formulated a "two-part approach to Second Amendment claims."  *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010).  The first step required an "historical inquiry"—exploring "whether the conduct at issue was understood to be within the scope of the right at the time of ratification."  *Id*.  "If the challenged regulation burden[ed] conduct that was within the scope of the Second Amendment as historically understood," the Court "move[d] to the second step of applying an appropriate form of means-end scrutiny."  *Id*.

In *United States v. Moore*, the Fourth Circuit relied on *Heller*'s principle that felon-in-possession laws are "presumptively lawful" to uphold § 922(g)(1) under a "more streamlined" *Chester* analysis.  666 F.3d 313, 318 (4th Cir. 2012).  The court held that the principle in *Heller* "negates a facial challenge to a felon in possession statute like § 922(g)(1)." *Id*.  Moreover, the court found that the defendant was not "within the category of citizens" that *Heller* said possessed a right to bear arms: "'law-abiding responsible citizens.'" *Id*. at 319 (quoting *Heller*, 554 U.S. at 635, and adding emphasis).[11]  The Fourth Circuit later held that "conviction of a felony necessarily removes one from the class of 'law-abiding, responsible citizens' for the purposes of the Second Amendment." *Hamilton v. Pallozzi*, 848 F.3d 614, 626 (4th Cir. 2017).

In *Bruen*, the Supreme Court elaborated on the framework of Second Amendment analysis. The Court struck down a New York firearm licensing scheme wherein applicants were required to prove that they had "proper cause" to carry a handgun in public for self-defense. *Bruen*, 142 S. Ct. at 2123.  The Court held that the "proper cause" requirement was too subjective and violated the Second Amendment. *Id*. at 2156.  *Bruen* rejected the second step of the test adopted by courts post-*Heller*–the "means-end scrutiny" analysis.  *Bruen*, 142 S. Ct. at 2125-26.  However, the Court noted that "[s]tep one of the predominant framework is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history." *Id*. at 2127.  The Court explained the proper standard in the Second Amendment context: *First*, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects

---

[11]    Since *Moore*, the Fourth Circuit consistently denied as-applied Second Amendment challenges to § 922(g)(1).  *See United States v. Smoot*, 690 F.3d 215, 221-22 (4th Cir. 2012); *Pruess*, 703 F.3d at 245-47; *United States v. Lunsford*, 470 F. App'x 184, 185 (4th Cir. 2012) (per curiam) (unpublished); *United States v. Kline*, 494 F. App'x 323, 324-26 (4th Cir. 2012) (per curiam) (unpublished); *United States v. Morrison*, 504 F. App'x 247, 250 (4th Cir. 2013) (per curiam) (unpublished); *Taylor*, 594 F. App'x at 790; *United States v. Thorpe*, 680 Fed. App'x 209, 211 (4th Cir. 2017) (per curiam) (unpublished).

that conduct."   *Second*, to justify regulation burdening that conduct, the government "must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id*. at 2126.

Bruen did nothing to abrogate the Court's holdings in *Heller* and *McDonald*.   Indeed, *Bruen* characterized its holding as consistent with those decisions.   *Bruen*, 142 S. Ct. at 2122 ("We . . . hold, consistent with *Heller* and *McDonald*, that the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home.").

Fourth Circuit precedent upholding § 922(g)(1) accords with the approach set out in *Bruen*, since those Fourth Circuit cases did not engage in the means-end scrutiny that *Bruen* rejected. Instead, they relied on *Heller* for the proposition that "longstanding" felon disarmament laws are "presumptively lawful," 554 U.S. at 626-27 & n.26, and that the Second Amendment protects the rights of "law-abiding, responsible citizens[.]"   *Id*. at 635; *see Hamilton*, 848 F.3d at 625-28; *Moore*, 666 F.3d at 318-20.   *Bruen* did nothing to upset those principles.   Justice Alito explained in concurrence that *Bruen* does not "disturb[ ] anything that [the Court] said in *Heller* or *McDonald* . . . about restrictions that may be imposed on the possession or carrying of guns." *Bruen*, 142 S. Ct. at 2157 (Alito. J., concurring).   And Justice Kavanaugh (joined by Chief Justice Roberts) emphasized that "the Second Amendment allows a 'variety' of gun regulations" and reiterated *Heller*'s statement about not "cast[ing] doubt on longstanding prohibitions on the possession of firearms by felons."   *Id*. at 2162 (Kavanaugh, J., concurring) (quotations omitted).

Mr. Powell contends that *"Bruen* makes clear that uncritical deference to *Heller's* 'presumptively lawful' language is no longer proper."   (ECF NO. 46 at 25.)   He notes that despite *Heller*'s observation that most 19th-century courts upheld "prohibitions on carrying concealed weapons," 554 U.S. at 626, *Bruen* nevertheless conducted a full historical analysis when

considering New York's license-to-carry scheme. *See Bruen*, 142 S. Ct. at 2135-56. Unlike the historical concealed-carry laws mentioned by *Heller*, however, the New York licensing scheme banned "public carry altogether." *Id.* at 2146. And, unlike laws dispossessing felons, the New York scheme burdened the firearm-carry rights of "ordinary, law-abiding, adult citizens." *Id*. at 2134. Thus, *Bruen*'s exhaustive historical analysis does not suggest that such analysis is necessary to uphold § 922(g)(1).

In short, *Bruen* did not uproot prior Supreme Court statements in *Heller* and *McDonald* and Fourth Circuit precedent on the viability of § 922(g)(1) like Mr. Powell suggests. It simply abrogated the means-end scrutiny step in the Fourth Circuit's framework for Second Amendment analysis. Accordingly, Fourth Circuit precedent remains good law and controls this issue—§ 922(g)(1) is constitutionally valid, both facially and as-applied. This Court can and should deny Mr. Powell's motion based on this precedent.

Less than a month ago, in *United States v. Rahimi*, the Supreme Court held that 18 U.S.C. § 922(g)(8) ("Section 922(g)(8)") is constitutional, rejecting the defendant's facial challenge. 144 S. Ct. at 1903. The *Rahimi* Court clarified its prior Second Amendment precedent, explaining that the same logic that extends the Second Amendment to even those arms that were not in existence in the founding era also permits laws that burden the Second Amendment even if those laws are not identical to founding era laws. *Id.* at 1897. The Court warned against looking for a "dead ringer" or a "historical twin". *Id. See e.g.*, After considering the "why" and "how" related to founding era surety laws and going armed laws as well as Section 922(g)(8), the *Rahimi* Court concluded that those were sufficiently "relevantly similar" to Section 922(g)(8) and rejected the defendant's constitutional claim.

14

*Rahimi* did not alter the Supreme Court's Second Amendment jurisprudence nor did it disturb the Fourth Circuit's jurisprudence. *Rahimi* does call into serious doubt the analysis of courts that require too close of a match between the "how" and "why" of the challenged regulation and the proffered historical analogues. *See*, *e.g.*, *United States v. Duarte*, 101 F.4th 657 (9th Cir. 2024). As the Supreme Court's latest word on the Second Amendment *Rahimi* controls and, as explained below, dictates that this Court deny Mr. Powell's Motion to Dismiss.

**1.  *Rahimi* Shows that Section 922(g)(1) is Constitutional.**

Mr. Powell spends significant energy laying out the analytical framework he believes the Court should adopt based on his reading of *Bruen*. He and "some courts have misunderstood the methodology of [the Supreme Court's] recent Second Amendment cases." *Rahimi*, 144 S. Ct. at 1897. Mr. Powell suggests that the court should apply a different standard depending on "whether t[he problem addressed by the statute] is old or new," (ECF No. 46 at 5, 15.) He also contends that for Section 922(g)(1) to be constitutional, the Government must demonstrate "that, around the time of the Founding, there existed a 'well established and representative' tradition of disarming people convicted of crimes like Mr. Powell's." (*Id.* at 22.) But, as explained below, this framing of the analytical approach is in direct contradiction to the guidance provided by the Supreme Court in *Rahimi*.

"[T]he appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition[,]" and the "court must ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit, 'apply[ing] faithfully the balance struck by the founding generation to modern circumstances.'" *Rahimi*, 144 S. Ct. at 1898 (quoting *Bruen*, 554 U.S. at 29). When considering the challenged regulation, the court is not looking for a "'dead ringer' or a 'historical twin.'" *Id.* (quoting *Bruen*, 554 U.S. at 30). The "[w]hy and how the regulation burdens the right are central

to this inquiry. . . . And when a challenged regulation does not precisely match its historical precursors, 'it still may be analogous enough to pass constitutional muster.'"  *Id.* (quoting *Bruen*, 554 U.S. at 30).

Mr. Powell posits that there are two standards for determining whether the challenged regulation satisfies the historical traditional analysis set forth in *Bruen*.  More specifically, he contends that if the "challenged statute 'addresses a general societal problem that has persisted since the 18th century,'" the Government "must point to a tradition of 'distinctly similar historical regulation[s].'"  (ECF No. 46 at 5 (quoting *Bruen*, 544 U.S. at 26).)  And where the regulation is "aimed at 'unprecedented societal concerns or dramatic technological changes' that would have 'unimaginable at the founding[,]'" the Government must show that the challenged regulation is "relevantly similar" to historical regulations.  Per Mr. Powell, because the problem of "felons' access to firearms, use of guns to commit crime, etc." has existed since the founding era, the "distinctly similar" standard applies.  (*Id.* at 15.)

Mr. Powell's position is misguided.  The applicable standard is the "relevantly similarly" standard and *Rahimi* shows why.  Start with the observation that the *Rahimi* Court did not find that because Section 922(g)(8) is of relatively recent vintage, it only needed to be "relevantly similar."  Nor did the Supreme Court discuss whether the problem of intimate partner violence was a founding era problem or a recent social concern.  The threshold inquiry Mr. Powell proposes simply was not engaged in by the *Rahimi* court.  When the *Rahimi* Court discussed founding era firearm regulations in the context of conducting Second Amendment analysis, it did not repeat the "distinctly similar" standard.  Instead, it offered that such a law might be "a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations."  *Rahimi*, 144 S. Ct. at 1898.  Critically, the *Rahimi* Court framed Section

922(g)(8) as "preventing individuals who threaten physical harm to others from misusing firearms" *id.* at 1898, surely a founding era problem as confirmed by the factual discussion of surety and going armed laws, but nonetheless applied a "relevantly similar" standard. The Court should apply the same standard here.

### 2. Prohibiting Felons from Possessing Firearms is Relevantly Similar to Historical Laws.

In *Rahimi*, the Supreme Court found that surety laws and going armed laws "confirm[ed] what common sense suggests: When an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed." *Id.* at 9. Surety laws "could be invoked to prevent all forms of violence" or "the misuse of firearms." *Id.* at 8. Going armed laws "provided a mechanism for punishing those who had menaced others with firearms." *Id.* (quoting 4 Blackstone 149) (cleaned up). The "why" justifying the Second Amendment burden of the surety laws, going armed laws, and Section 922(g)(8) is simple—"to mitigate demonstrated threats of physical violence." *Rahimi,* 144 S. Ct. at 1901.

The "why" justifying the Second Amendment burden of Section 922(g)(1) is the same the "why" justifying surety laws and going armed laws. Section 922(g)(1) is a provision "in a series under § 922(g) that disarm certain individuals whom Congress determined pose a heightened danger of misusing a firearm[.]" *United States v. Mahin*, 668 F.3d 119, 122 (4th Cir. 2012). All three regulations—surety laws, going armed laws, and Section 922(g)(1)—restrict firearm possession based on a determination that certain individuals pose an increased risk of future violence involving the use of a firearm. The "why" behind the laws are the same, and at the least they are "relevantly similar."

With a match between the "why" of historical regulations and Section 922(g)(1), the next step is analyzing "how" the Second Amendment is burdened. *Rahimi* once again provides an

17

answer to this question—Section 922(g)(1) burdens the Second Amendment in ways that our historical traditions permit.  Under the surety laws, "individuals suspected of future misbehavior" were subject to restrictions on their ability to carry firearms and punishment for violation of that restriction.  *Rahimi*, 144 S. Ct. at 1900.  Section 922(g)(1) restricts individuals, who Congress determined posed a heightened danger of future misuse of firearms, from possessing a firearm and punishes them for violating that restriction.  Such ex-ante restrictions based on prior conduct and a determination of the potential for future misuse of firearms clearly comports with our historical traditions.

Mr. Powell may claim that the due process protections provided to the individuals subject to surety and going armed laws as well as Section 922(g)(8) make those restrictions meaningfully different from Section 922(g)(1).  This is incorrect.  The *Rahimi* Court certainly discusses how surety laws, going armed laws, and Section 922(g)(8) involved "judicial determinations of whether a particular defendant likely would threaten or had threatened another with a weapon." *Id.* at 1902.  But the *Rahimi* Court did not say that Congress could not make the legislative determination that whole classes of individuals pose an elevated danger of misuse of a firearm.  In fact, the *Rahimi* Court specifically caveated their discussion of such judicial determinations by stating that they were "<u>not</u> sugges[ting]  that the Second Amendment prohibits the enactment of laws banning the possession of guns by categories of persons thought by a legislature to present a special danger of misuse[.]" *Id.* at 1901.  Notably, a person is only subject to Section 922(g)(1)'s prohibition *after* they have received the full panoply of the due process protection afforded to defendants in criminal matters pursuant to the U.S. Constitution and if a federal prosecution: the Federal Rules of Criminal Procedure, numerous federal statutes, federal common law, and if a state criminal

prosecution: the relevant state Constitution as well as the applicable statutory and common law protections.

Mr. Powell claims that Section 922(g)(1)'s prohibition sweeps too broadly by capturing a group of individuals one level of generality removed from what Founding-Era laws permitted. *See* ECF No. 46 at 20. But the Supreme Court has cautioned against looking for "dead ringers" or "historical twins." *Rahimi*, 144 S. Ct. 1889 at 1898. The *Rahimi* Court did not require an exact match between the group of people subject to Section 922(g)(8) and surety laws or going armed laws. The match between the "how" and the "why" was sufficient and the same reasoning applies to Section 922(g)(1).

Mr. Powell may claim that the limited duration of a surety bond or Section 922(g)(8)'s prohibition make them distinguishable from Section 922(g)(1). Again, not so. Congress has provided that convictions that have been expunged, set aside, or for which the individual has been pardoned or had their civil rights restored do not count as felonies under Section 922(g)(1). *See* 18 U.S.C. § 921(a)(20). Thus, like an individual subject to a surety bond or Section 922(g)(8), an individual subject to Section 922(g)(1)'s prohibition has an opportunity to relieve themselves of that prohibition.

*Rahimi* makes clear that Section 922(g)(1)'s prohibition on felons possessing firearms comports with our historical traditions. The Court should adopt the reasoning of *Rahimi* and deny Mr. Powell's Motion to Dismiss.

## II.   THE COURT SHOULD DENY MR. POWELL'S MOTION TO SUPPRESS TANGIBLE AND DERIVATIVE EVIDENCE BECAUSE THE AUTOMOBILE EXCEPTION APPLIES.

Mr. Powell seeks to suppress "any items seized or obtained as a result of" his traffic stop. (ECF No. 45 at 2.) This includes the Polymer 80 9mm handgun, the switch attached to the handgun, sixty-three rounds of ammunition found in two different extended magazines, and four

cellphones and any evidence located on those phones.  Mr. Powell contends that the officers who initiated the traffic stop "lacked any objectively reasonable grounds for initiating th[e] traffic stop[,]" that is to say, the officers "lacked the requires probable cause or reasonable articulable suspicion that criminal activity was afoot to justify" the stop.  *Id.*

The Court should deny Powell's motion because the officers who stopped the vehicle had probable cause to initiate the stop based on their observations of Mr. Powell via the CCTV, their knowledge that he was prohibited from carrying a firearm, and their belief that Powell was carrying a handgun and then had placed that handgun in the passenger compartment of his vehicle.  While Powell does not argue that the search of his vehicle was improper, the Government notes that the vehicle exception to the Fourth Amendment applies to this case.  Moreover, once the officers located the handgun in Powell's car, they were constitutionally able to search the remainder of the vehicle.

### A. Officers Were Justified in Stopping Powell's Vehicle and Removing Him From the Car.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]"  U.S. Const. amend. IV. "[S]topping an automobile and detaining its occupants constitute a 'seizure' within the meaning of those Amendments, even though the purpose of the stop is limited and the resulting detention quite brief."  *Delaware v. Prouse*, 440 U.S. 648, 653 (1979).  "The Supreme Court's analysis in Terry governs routine traffic stops," and "[t]o determine the limits of police conduct, *Terry* employs a dual inquiry: 'whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first

place.'" *United States v. Meikle*, 407 F.3d 670, 672 (4th Cir. 2005) (quoting *Terry v. Ohio*, 392 U.S. 1, 20 (1968)).

"An officer must have reasonable suspicion of criminal activity to perform an investigative stop authorized by *Terry*[.]" *United States v. Gardner*, 823 F.3d 793, 799 (4th Cir. 2016). This means that "the officer must have a 'particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *Id.* (quoting *Navarette v. California*, 572 U.S. 393, 396 (2014)). "This standard is less demanding than the probable cause standard, and can be based on 'information that is less reliable than that required to show probable cause.'" *Id.* (quoting *Alabama v. White*, 496 U.S. 325, 330 (1990)).

Here, the officers had the requisite particularized and objective basis for suspecting that Mr. Powell was engaged in criminal activity. *First*, the officers had observed Mr. Powell, whom they knew to have prohibiting convictions, walking down a public street clutching what appeared to be a handgun in his pajama pants. This violated Maryland Public Safety Code § 5-133. The officers also observed Mr. Powell enter the driver's seat of his vehicle with the suspected handgun and exit moments later no longer needing to support the handgun in pants. This sequence of events would allow an officer to conclude that Mr. Powell had stashed the handgun in his vehicle in violation of Maryland Criminal Code § 4-203. As a result, at the time the officers initiated the traffic stop, based on their own observations and conclusions, they had an objective basis to believe that Mr. Powell had or was in the process of committing at least two felony violations of Maryland law.

Mr. Powell may argue that the officer's actions of removing him from the vehicle go beyond the permissible scope of a "routine traffic stop." *See United States v. Rusher*, 966 F.2d 868, 876 (4th Cir. 1992) (describing "routine traffic stop" as one where officers "may request a

driver's license and vehicle registration, run a computer check, and issue a citation.").  But this was not an ordinary traffic stop based on a violation of motor vehicle laws.  Instead, Mr. Powell was stopped because of the officer's belief that he was in the process of committing multiple felonies related to the handgun he possessed and was transporting in his car.  In *United States v. Singh*, the Fourth Circuit recognized that a traffic stop based on something other than a traffic infraction could justify a seizure that goes beyond a "routine traffic stop."  363 F.3d 347, 356 (4th Cir. 2004).  The same applies here—the scope of the seizure was defined by the officer's reasonable suspicion that Powell possessed a handgun and "officers are entitled to conduct an investigatory detention to obtain consent search or to develop probable cause."  *Singh*, 363 F.3d at 357.  Officers were also entitled to remove Mr. Powell from his vehicle for their safety.  *See Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977).  Mr. Powell cannot raise any legitimate arguments regarding the duration of the stop because as he was removed from the vehicle, an officer saw the handgun in plain view under his driver's seat and he was arrested as a result.

In sum, the traffic stop was justified by the officers' reasonable articulable suspicion that Mr. Powell was in violation of Maryland law based on their observations of him.  The scope of the stop was permissible because it evolved into an arrest in a matter of seconds based on the officer's observation that Mr. Powell did, in fact, have a gun under the driver's seat of the vehicle.

While Mr. Powell does not challenge the search of his vehicle, the Government notes that "[p]olice, without a warrant, may 'search an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained.'"  *United States v. Gondres-Medrano*, 3 F.4th 708, 713 (4th Cir. 2021) (quoting *California v. Acevedo*, 500 U.S. 565, 580 (1991)).  Here, officer's had probable cause to believe Mr. Powell's vehicle contained contraband once they observed the handgun under the driver's seat.  Moreover, because the registration on

Mr. Powell's vehicle was suspended and he had been arrested, meaning the car was subject to impoundment, officers were able to conduct an inventory search of the vehicle without running afoul of the Fifth Amendment. *United States v. Bullette*, 854 F.3d 261, 265 (4th Cir. 2017) ("An inventory search of an automobile is lawful (1) where the circumstances reasonably justified seizure or impoundment, and (2) law enforcement conducts the inventory search according to routine and standard procedures designed to secure the vehicle or its contents.")

### III.  THE COURT SHOULD DENY MR. POWELL'S MOTIONS TO SUPPRESS STATEMENTS SEIZED BECAUSE THE STATEMENTS FOLLOWED MIRANDA WARNINGS AND WERE VOLUNTARY.

Mr. Powell seeks to suppress any statements he made to law enforcement during and after the traffic stop. (ECF No. 47at 1.) He seeks a hearing, pursuant to 18 U.S.C. § 3501, on the issue of voluntariness. The Court should deny Mr. Powell's motion because he was given the *Miranda* warnings twice and any statements Mr. Powell made were entirely voluntary.

#### A.  Mr. Powell Was Advised of His Rights Under Miranda.

The Fifth Amendment prohibits compelled self-incrimination. U.S. Const. amend. V. Members of law enforcement must inform individuals who are in custody of their Fifth Amendment rights prior to interrogation. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Any individual in police custody and subject to custodial interrogation "must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Berkemer v. McCarty*, 468 U.S. 420, 429 (1984) (quoting *Miranda*, 384 U.S. at 444). Officers may issue *Miranda* warnings orally or in writing. *See, e.g.*, *United States v. Abdi Wali Dire*, 680 F.3d 446, 474 (4th Cir. 2012) (upholding oral warnings). *Miranda* warnings are not required simply because a suspect is taken into custody. *See Rhode Island v. Innis*, 446 U.S. 291, 300 (1980). Instead,

23

*Miranda* warnings are required when a suspect in custody is subjected to interrogation or its functional equivalent.  *Id.*

Powell received the *Miranda* warnings approximately thirteen minutes after the traffic stop was initiated.  The officer read them verbatim from the card pictured below.



The officer sought and received verbal confirmation from Mr. Powell that he understood each warning before proceeding to the next.  Mr. Powell declined to speak to officers and officers did not seek to question him.  The limited interactions officers had with him prior to his transport was primarily regarding the tightness of his handcuffs, which officers repeatedly adjusted for Mr. Powell's comfort.  These interactions were records on the transport officer's and others' BWC.

### B. Mr. Powell's Volunteered Statements Do Not Implicate *Miranda* and Should Not be Suppressed.

Mr. Powell did not make any statements in response to police interrogation that the Government will seek to admit. Instead, the Government will seek to admit statements Mr. Powell made voluntarily and without questioning, primarily his statement regarding the powder he spread in the back of the transport SUV – "this ain't drugs, it's soap powder."

In *Rhode Island v. Innis*, the Supreme Court considered whether statements made by the defendant while he was being transported by three officers implicated *Miranda*. *See R.I. v. Innis*, 446 U.S. 291 (1980). The officers were discussing a missing shotgun and one officer mentioned that it would be "too bad" if a small child located the firearm and hurt herself with it. *Id.* at 295. The defendant interrupted the officers and told the officers they should turn the transport vehicle around so he could show them where the shotgun was. *Id.* The Supreme Court held that the officers had not subjected the defendant to express questioning or its "functional equivalent" and, as a result, the defendant was "not 'interrogated' within the meaning of *Miranda*." *Id.* at 308.

Like in *Innis*, the Court should find that Mr. Powell was not subjected to interrogation within the meaning of *Miranda*. Similar to *Innis*, Mr. Powell's statement regarding the powder was not in response to express questioning or it's functional equivalent. *See United States v. Johnson*, 734 F.3d 270, 277 (4th Cir. 2013) (stating that the question arising from *Innis* is whether the officer should have known that the officer's statements "was reasonably likely to elicit an incriminating response or, in other words, whether he should reasonably have foreseen that result") The transport officer was not speaking to Mr. Powell. He was describing to the other officer the events that had occurred. Moreover, the officer only made a brief remark, not "a lengthy harangue in the presence of" Powell. *Innis*, 446 U.S. at 303. The officer had previously warned Mr. Powell about the fact that his SUV was clean and anything discovered in the back would be attributed to

25

Mr. Powell.  But this was not meant to elicit an incriminating statement.  These statements are similar to the statements the Supreme Court ruled in *Innis* did not implicate *Miranda* and were not subject to suppression.  This Court should reach the same conclusion regarding Mr. Powell's statements and deny his Motion to Suppress.

## CONCLUSION

For all of the foregoing reasons, the Government respectfully requests that the Court deny Mr. Powell's motions in their entirety.

Respectfully submitted,

Erek L. Barron
United States Attorney

By:        _____/s/_____
Stanton Lawyer
Patricia McLane
Assistant United States Attorneys